1  Kenneth K. Lee (Cal. Bar No. 264296) (*pro hac vice*)
   klee@jenner.com
2  L. David Russell (Cal. Bar No. 260043) (*pro hac vice*)
   drussell@jenner.com
3  **JENNER & BLOCK LLP**
   633 West 5th Street, Suite 3600
4  Los Angeles, CA 90071
   Telephone:  (213) 239-5100
5  Facsimile:  (213) 239-5199

6  John G. Kerkorian (01224)
   Craig C. Hoffman (026017)
7  **BALLARD SPAHR LLP**
   1 East Washington, Suite 2300
8  Phoenix, Arizona 85004
   Telephone:  (602) 798-5400
9  Facsimile:  (602) 798-5595

10 Attorneys for Plaintiff Luis Virata

11              UNITED STATES DISTRICT COURT

12                  DISTRICT OF ARIZONA

| | |
|---|---|
| 13 LUIS VIRATA, an individual, )<br>14        Plaintiff, )<br>15 vs. )<br>16 ERIC ZEMKE, an individual; MICHAEL J. )<br>HELENIC III, an individual; WORLDWIDE )<br>17 AIR MEDICAL TRANSPORT, an Arizona )<br>business entity; ARCHANGEL AIR )<br>18 AMBULANCE, an Arizona business entity; )<br>TRAUMA FLIGHT INC., an Arizona )<br>19 corporation; TRAUMA FLIGHT 2, INC., an )<br>Arizona corporation; REVENUE )<br>20 ENHANCEMENT SPECIALISTS LLC, a )<br>Delaware limited liability company; STEVE )<br>21 WALLACE, an individual; ACLS PEGASUS, )<br>LLC, a Florida limited liability company; and )<br>22 DOES 1 through 100, inclusive, )<br>23       Defendants. )<br>24 REVENUE ENHANCEMENT SPECIALISTS LLC, )<br>a Delaware limited liability company, )<br>25       Cross-Claimant, )<br>26 vs. )<br>27 ALEC S. WALLACE, JR. a/k/a STEVE )<br>WALLACE, an individual; ACLS PEGASUS, )<br>28 LLC, a Florida limited liability company, )<br>      Cross-Defendants. )| Case No. CV-11-988-PHX-DGC<br><br>**FIRST AMENDED COMPLAINT**<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY**<br><br>1.  **Breach of Contract and Implied Covenant of Good Faith and Fair Dealing**<br><br>2.  **Breach of Contract and Implied Covenant of Good Faith and Fair Dealing (Third Party Beneficiary)**<br><br>3.  **Conversion**<br><br>4.  **Common Law Fraud**<br><br>5.  **Consumer Fraud**<br><br>6.  **Negligent Misrepresentation**<br><br>7.  **Intentional Infliction of Emotional Distress** |

1

**INTRODUCTION**

2       1.    This case is about unscrupulous businessmen who preyed on a grieving

3   family during a time of turmoil, and exploited their vulnerability to bilk them of

4   nearly $130,000.

5       2.    In April 2011, Plaintiff Luis Virata's sister, Giovanna Virata, was given

6   the grim news that her terminal cancer had worsened and that she was in the twilight

7   of her life.  After deliberating with her family, Giovanna decided that she would halt

8   treatment and return home to the Philippines to spend the last several weeks of her life

9   with loved ones.

10       3.    Grief-stricken and feeling helpless, Mr. Virata wanted to do all he could

11   to comfort his ailing sister during her last days.  Her body ravaged by a metastasizing

12   cancer and leukemia, Giovanna could no longer walk and needed constant medical

13   attention.  Mr. Virata, through his agents, contacted Defendants Eric Zemke and

14   Michael J. Helenic III to arrange an "air ambulance" — a private jet with medical

15   professionals who can take care of a passenger patient — to transport his sister back

16   home to Manila.

17       4.    Defendants Zemke and Helenic initially informed Mr. Virata's agents

18   that it would cost $135,000 to charter this air ambulance.  Desperate to have his sister

19   return home as soon as possible, Mr. Virata agreed to the price and entered into a

20   contract with Defendants Zemke and Helenic and their business entities.  Mr. Virata

21   wired $135,000 to the business bank account of Defendant Revenue Enhancement

22   Specialists, an entity controlled and/or owned by Defendant Helenic.

23       5.    Defendants Zemke and Helenic repeatedly attempted to "up-sell,"

24   suggesting that Mr. Virata should charter an even more expensive air ambulance.

25   When Mr. Virata made clear that he wanted to proceed forward with the agreed upon

26   jet, Defendants Zemke and Helenic suddenly claimed that they had difficulty

27   obtaining the services of an air ambulance.

28

6.      They said that Defendant Steve Wallace of ACLS Pegasus, LLC, another air ambulance service based in Florida, could charter a private jet for them. Defendants Zemke and Helenic then entered into a contract with Wallace and ACLS Pegasus with Mr. Virata as the intended third-party beneficiary of the contract.

7.      Of the $135,000 that he had received from Mr. Virata, Defendant Helenic deposited $127,500 into Defendant Wallace's business bank account and — without informing Mr. Virata — kept the remaining $7,500 as an "administrative" fee.

8.      Defendants Wallace and ACLS Pegasus, however, failed to provide the air ambulance for Giovanna. They unilaterally cancelled the flight by falsely stating that they had not received the funds. Documents from their bank Wells Fargo, however, show that $127,500 was deposited into ACLS Pegasus' bank account and that Defendant ACLS Pegasus' own banker even e-mailed Defendant Wallace a copy of the deposited cashier's check.

9.      Despite refusing to provide the chartered flight, Defendant Wallace did not return the $127,500. Instead Defendant Wallace stated that he would be willing to charter another flight for Giovanna if Mr. Virata paid him $214,900 for a more expensive air ambulance flight. Realizing that Defendant Wallace was engaging in a scam targeted at vulnerable family members in their hour of need, Mr. Virata refused to pay the additional $87,400 and demanded the return of the $127,500. Defendant Wallace has refused to do so.

10.     Plaintiff Mr. Virata brings this complaint against Defendants Wallace, Zemke, Helenic and their respective business entities seeking both compensatory and punitive damages as well as attorneys' fees.

## THE PARTIES

11.     Plaintiff is, and at all times relevant hereto was, an individual residing in the Republic of the Philippines.

12.     Defendant Eric Zemke is, and at all times relevant hereto was, an

1 | individual residing Arizona.

2 |     13.    Defendant Michael J. Helenic III is, and at all times relevant hereto was,
3 | an individual residing in Scottsdale, Arizona.

4 |     14.    Defendant Worldwide Air Medical Transport ("Worldwide") is, and at
5 | all times relevant hereto was, a business entity that has its principal place of business
6 | in Arizona and operates in that state.

7 |     15.    Defendant Archangel Air Ambulance ("Archangel") is, and at all times
8 | relevant hereto was, a business entity that has its principal place of business in
9 | Arizona and operates in that state.

10 |     16.    Defendant Trauma Flight Inc. ("Trauma Flight") is, and at all times
11 | relevant hereto was, a corporation organized under the laws of Arizona, maintaining
12 | its principal business office in Arizona.  Defendant Helenic is, and at all times
13 | relevant hereto was, the chairman of Trauma Flight.

14 |     17.    Defendant Trauma Flight 2, Inc. ("Trauma Flight 2") is, and at all times
15 | relevant hereto was, a corporation organized under the laws of Arizona, maintaining
16 | its principal business office in Arizona.  Defendant Helenic is, and at all times
17 | relevant hereto was, director of Trauma Flight 2.

18 |     18.    Defendant Revenue Enhancement Specialists LLC ("Revenue
19 | Enhancement Specialists") is, and at all times relevant hereto was, a limited liability
20 | company organized under the laws of Delaware, maintaining its principal business in
21 | Scottsdale, Arizona.  Defendant Helenic is, and at all times relevant hereto was, the
22 | managing partner of Defendant Revenue Enhancement Specialists LLC.

23 |     19.    Defendant Steve Wallace is, and at all times relevant hereto was, an
24 | individual residing in Florida.

25 |     20.    Defendant ACLS Pegasus LLC ("ACLS Pegasus") is, and at all times
26 | relevant hereto was, a limited liability company organized under the laws of Florida,
27 | maintaining its principal place of business in Florida.

28 |

## JURISDICTION

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.
1332(a).  Diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) is met because the
amount in controversy exceeds $75,000.00 and there is complete diversity between
the Plaintiff and Defendants.

## VENUE

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a
substantial part of the events giving rise to the claim occurred in this district, and the
defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Giovanna Virata is diagnosed with ovarian cancer

23.     In 2008, Giovanna Virata, Plaintiff's younger sister, was diagnosed with
stage 3 ovarian cancer.  To receive the best care that she could, she was admitted to
the renowned Mayo Clinic Cancer Center in Scottsdale, Arizona.  After surgery and
months of painful chemotherapy, her cancer appeared to be in remission.

24.     But in January 2011, Giovanna started suffering from a serious fever
and was admitted into the hospital.  Her doctors discovered that her cancer had
metastasized.  Even worse, the chemotherapy treatments had weakened her immune
system, exposing her to a very aggressive and deadly form of leukemia.

25.     On March 20, 2011, Giovanna was admitted again to the Mayo Clinic
Cancer Center to obtain additional cancer treatments.  After approximately two weeks
of treatments, Giovanna's condition deteriorated further and her physicians advised
that she would not likely improve from additional treatments.  Her body had been
under siege by the effects of cancer and leukemia, leaving her unable to walk on her
own and sapped of energy.  Mr. Virata immediately flew in from the Philippines to
comfort his sister and discuss her options.

26.     At this point, Giovanna — with her family's help — made the difficult
decision to stop treatment.  It meant that death was imminent but she would no longer

1    have to suffer through the painful treatments.  Giovanna's remaining desire was to

2    surround herself with friends and family in her native Philippines, where she intended

3    to live out the remaining weeks of her life.

4        27.    Distraught but determined to provide the best care for his ailing sister,

5    Mr. Virata sought to charter an "air ambulance" to transport her from Arizona back to

6    the Philippines.  An air ambulance flight would allow Giovanna — who at this point

7    could no longer walk — to travel comfortably while being cared for by a team of

8    medical professionals.

9        28.    Mr. Virata felt a special obligation to take care of Giovanna because he

10   was her only sibling and she did not have a family of her own.  Although he was

11   deeply saddened that Giovanna's doctors could do nothing for her, Mr. Virata took

12   solace that he would at least be able to charter an air ambulance to offer mental and

13   physical comfort to his sister during her last journey home and spend as much time as

14   possible with her during her last days.

15       **Defendants Helenic and Zemke agree to provide an "air ambulance"**

16       29.    Mr. Virata made inquiries regarding air ambulance services available

17   for hire.  Louise Reilly, a registered nurse caring for Giovanna, spoke to Christopher

18   Calderwood, an employee of the Mayo Clinic, and obtained the name of Defendant

19   Worldwide Air Medical Transport as an air ambulance service provider.

20       30.    Plaintiff's agents asked Ms. Reilly to contact Defendant Worldwide to

21   obtain a quote for an air ambulance service charter flight from Arizona to Manila,

22   Philippines.  On April 6, 2011, Ms. Reilly spoke with Defendant Zemke, flight

23   coordinator for Defendants Worldwide and Archangel Air Support.  Mr. Zemke stated

24   that Worldwide and/or Archangel could provide the requested air ambulance for

25   Giovanna, and offered to charter a G4 air ambulance for a total cost of $135,000.  On

26   information and belief, Defendant Zemke made this offer on behalf of himself and/or

27   Defendants Helenic, Archangel, Trauma Flight, Inc., Trauma Flight 2, Inc., and

28   Revenue Enhancement Specialists LLC.

31.     Ms. Reilly informed Defendant Zemke that Giovanna was suffering from terminal cancer and the reason for her flight. Plaintiff, through his agents, also informed Defendant Helenic of Giovanna's medical condition and the reason for her flight.

32.     On April 7, 2011, Defendant Zemke sent an email with international wire instructions and bank account information to Plaintiff's family friend, Marisa Tantoco, who was acting as Plaintiff's agent. The bank account Defendant Zemke identified belonged to Defendant Revenue Enhancement Specialists, an entity owned and/or controlled by Defendant Helenic.

33.     Grieving and wanting his dying sister to travel home as quickly and as comfortably as possible, Mr. Virata accepted the Defendants' offer immediately and wired $135,000 into the bank account of Revenue Enhancement Specialists.

34.     Later on April 7, 2011, Defendant Helenic called Plaintiff's agent, Ms. Tantoco, stating that Defendant Zemke had given an incorrect quote and that chartering a G-4 ambulance would cost far more than the already-deposited $135,000. Defendant Helenic explained that chartering a G4 would cost approximately $260,000. Defendant Helenic also offered the option of chartering a much smaller plane, a Lear 36, for $135,000. Defendant Helenic said that he neglected to include an additional $7,500 for the cost of the medical personnel to accompany Giovanna. On information and belief, Mr. Helenic made this offer on behalf of himself and/or Defendants Zemke, Archangel, Trauma Flight, Trauma Flight 2, and Revenue Enhancement Specialists.

35.     While frustrated by the misrepresentation and the reneging of the agreement, Plaintiff, through his agent Ms. Tantoco, accepted the offer to charter the Lear 36 air ambulance, given the urgency and the emotional toll of dealing with an ailing family member. The parties also agreed that the $135,000 Plaintiff already deposited in Mr. Helenic's bank account would be used to pay for the flight, and that the remaining $7,500 for the medical personnel would be paid later. Both Mr.

Helenic and Plaintiff intended to be bound by this agreement, and each made that intention known to the other party. Shortly thereafter, Plaintiff left Arizona for the Philippines to make further arrangements for his dying sister.

36.     Apparently sensing the desperation of Plaintiff and his family and friends to transport Giovanna home, on April 8, 2011, Defendant Helenic sent numerous emails to Ms. Tantoco pressuring her to upgrade to a bigger and more expensive plane. Ms. Tantoco felt pressured, but repeatedly declined to upgrade. Later on April 8, 2011, Defendant Helenic confirmed the Charter of the Lear 36 and provided flight details. The chartered flight was scheduled to leave Arizona for the Philippines on April 10, 2011.

**Defendants Helenic and Zemke breach the agreement but sub-contract the air ambulance service to Defendants Wallace and ACLS Pegasus**

37.     On the morning of April 9, 2011, Defendant Helenic telephoned Ms. Tantoco to confirm the charter of the Lear 36. Ms. Tantoco again confirmed.

38.     At around 6 p.m. that same evening, Ms. Tantoco contacted Defendant Helenic to obtain details regarding how to transfer Giovanna from the hospital to the chartered air ambulance. For the first time, Defendant Helenic indicated that he was unable to live up to his obligations under the agreement and could not provide the agreed-upon charter plane.

39.     Defendant Helenic, however, said that he reached out to Defendant Wallace and his company Defendant ACLS Pegasus, and that they agreed to provide the chartered Lear 36, along with the medical personnel for Giovanna's flight to the Philippines. On information and belief, Defendant Helenic and his entities had subcontracted the air ambulance service to Defendants Wallace and ACLS Pegasus. Defendant Helenic communicated information regarding Giovanna's dire medical condition to Defendant Wallace, as well as the reason for her flight.

40.     On information and belief, Defendants Helenic and/or Zemke communicated with Defendant Wallace on the evening of April 8 and again on the

morning of April 9 regarding payment for the air ambulance.  On information and belief, Defendant Wallace offered to provide a chartered flight for Giovanna as long as $127,500 was deposited into ACLS Pegasus' Wells Fargo/Wachovia bank account. On information and belief, Defendants Helenic and/or Zemke accepted this offer, on behalf of themselves and/or Defendants Zemke, Archangel, Trauma Flight, Trauma Flight 2, and Revenue Enhancement Specialists.  All the Defendants understood that Mr. Virata would be the third-party beneficiary of this agreement.  Both Mr. Helenic and/or Zemke and Mr. Wallace intended to be bound by this agreement, and each made that intention known to the other party.

41.     On the morning of April 9, 2011, Defendants Helenic and/or Zemke deposited $127,500 — out of the $135,000 that Mr. Virata had wired to them two days earlier — into the Wells Fargo/Wachovia bank account of ACLS Pegasus. Unknown to Mr. Virata, Defendants Helenic and Zemke kept the remaining $7,500 as administrative fee (most of which has since been returned to Mr. Virata).

42.     At 11:42 a.m. that same day, Michael Capuano of Wells Fargo/Wachovia e-mailed his banking client, Defendant Wallace, that $127,500 had been deposited into the bank account of his company, ACLS Pegasus.

43.     Mr. Capuano explained to Defendant Wallace that the amount would not likely appear on his "on-line" bank account until Monday but assured him that the funds were deposited and available.  Mr. Capuano also attached a copy of the deposited certified check, along with a deposit receipt.

44.     Mr. Capuano's e-mail to Defendant Wallace in its entirety reads as follows:

> **From**: Capuano, Michael
>
> **Sent**: Saturday, April 09, 2011 11:42 AM
>
> **To**: medflight7@comcast.net
>
> Steve,
>
> Here is the copy of the cashier's check as well as a copy of the receipt

showing that the funds were deposited today with NO HOLD.  Because
it is the weekend and your account is still technically under the
Wachovia umbrella, it may take until Monday for the funds to actually
show up on your Wachovia Online Banking.  The cashier's check is
guaranteed funds and has been fully verified.  Let me know if I can do
anything else to help.

*See* Exhibit A.

**Defendant Wallace unilaterally cancels the flight and refuses to return the**
**$127,500 unless Mr. Virata agrees to pay an additional $87,400 to charter a more**
**expensive flight**

45.   Despite receiving the $127,500 for the agreed-upon air ambulance,
Defendants Steve Wallace and ACLS Pegasus refused to perform their obligations
under the agreement.  They unilaterally cancelled the flight by falsely claiming that
they had not received the $127,500.

46.   As set forth above, it is indisputable that $127,500 was deposited into
Defendant ACLS Pegasus' bank account on or about the morning of April 9, and that
Defendant Wallace was advised of this deposit.

47.   At 3:58 p.m. on April 9 — over four hours *after* Defendant Wallace had
received the e-mail from his banker Mr. Capuano of Wells Fargo/Wachovia stating
that $127,500 was deposited into Defendant ACLS Pegasus' bank account —
Defendant Wallace falsely asserted in an e-mail that he had not received the money:

We have confirmed with Wachovia Bank again just a few minutes ago on line
and there is no deposit and no pending transactions or pending deposits in the
company's bank account…. Because your expected payment has not been
received in our company's bank account we have notified the aircraft operator
and crew to stand down and thus you have cancelled your flight scheduled this
weekend to Manila.

48.   At the time that he wrote that e-mail, Defendant Wallace knew that the

1  above statements were false and/or misleading.  As set forth above, Defendant

2  Wallace's own banker earlier that day advised him that the $127,500 had been

3  deposited and was available, even though the funds would not be reflected in the "on-

4  line" bank statement for a few days.

5       49.    Defendant Wallace falsely stated that ACLS Pegasus was entitled to

6  keep the full $127,500 under a purported cancellation policy.  There is no binding

7  cancellation policy that allows Defendants Wallace or ACLS Pegasus to retain any

8  amount.  Furthermore, even if such a binding cancellation policy existed, it was

9  Defendant Wallace who unilaterally cancelled the flight on the false pretext that the

10  $127,500 had not been deposited into ACLS Pegasus' bank account.

11       50.    On April 12, Defendant Wallace sent a letter falsely stating that "any

12  payment tendered for this flight has not been cleared by Wachovia Bank this

13  company's bank."  Defendant Wallace knew that this statement was false because

14  Michael Capuano of Wells Fargo/Wachovia bank informed him on April 9 that the

15  "funds were deposited today with NO HOLD" and that deposited "cashier's check is

16  guaranteed funds and has been fully verified."

17       51.    Defendant Wallace stated that he would waive ACLS Pegasus'

18  purported cancellation policy if Mr. Virata scheduled a substantially more expensive

19  air ambulance flight for $214,900.

20       52.    Defendants Wallace and ACLS Pegasus knew that Mr. Virata's sister

21  was suffering from a serious medical condition and that Mr. Virata was desperate to

22  quickly charter an air ambulance to transport his sister to Manila.

23       53.    Aware of the emotional turmoil and duress on Mr. Virata, Defendants

24  Wallace and ACLS Pegasus intended to extort him by refusing to turn over the

25  $127,500 and demanding an additional $87,400 to charter a more expensive air

26  ambulance flight.

27       54.    Sensing that Defendant Wallace was involved in a scam to extract

28  money from a grieving and desperate family, Mr. Virata declined to pay the additional

11

1   tens of thousands dollars to Defendant Wallace.

2       55.    Unable to charter a flight from the Defendants, Mr. Virata reserved a

3   commercial flight for Giovanna back to the Philippines.  This flight left on April 15,

4   2011, five days after Giovanna intended to leave Arizona originally.  In order to

5   complete the trip to the Philippines, Giovanna needed to have a blood transfusion to

6   boost her strength.  These transfusions are only effective for three days.  In

7   anticipation of the April 10, 2011 departure, Giovanna had earlier completed a

8   transfusion, which was a stressful and uncomfortable experience for her.  Due to the

9   Defendants' failure to provide an air ambulance, Giovanna had to go through yet

10  another painful round of blood transfusions, since the effectiveness of the previous

11  transfusion had worn off.

12      56.    Giovanna's commercial flight had one stopover and took a total of 20

13  hours.  Giovanna was forced to fly in great discomfort; she was on a stretcher for the

14  duration of the voyage.  Based on the great pain and discomfort she experienced her

15  previous international flight, Giovanna had to be sedated for the entire trip.

16      57.    Giovanna was unable to spend much time with her family and friends in

17  the Philippines.  Due to the five-day delay caused by Defendants' actions, she lost

18  precious days that she could have spent with her family and friends back home in

19  Philippines.  On April 26, 2011 — less than a week after arriving in Manila —

20  Giovanna lost her fight with cancer and died at the age of 51.

21      58.    To this day, the Defendants have refused to return any of the $127,500

22  to Mr. Virata.

23      59.    As a result of the Defendants' actions, Mr. Virata has suffered

24  tremendous emotional anguish, pain, and distress, knowing that his dying sister had to

25  unnecessarily undergo two painful blood transfusions in a single week and suffered

26  tremendously during her commercial flight back to Philippines.  He also suffered

27  severe emotional anguish, pain and distress because he lost five days that he could

28  have spent with his sister during the last two weeks of her life.

## Relationship between Steve Wallace & ACLS Pegasus

59(a). On information and belief, there is such a unity of interest and ownership between ACLS Pegasus and Steve Wallace, that the separate personalities between ACLS Pegasus and Steve Wallace no longer exist, and that failure to disregard these separate identities would result in fraud or injustice.

59(b). On information and belief, when ACLS Pegasus was formed on September 17, 2010, it was severely undercapitalized, and lacked initial financing that was reasonably adequate to maintain solvency.

59(c). ACLS Pegasus does not only operate under the name "ACLS Pegasus," but also operates and conducts business under the names "Steve Wallace," "Advanced Care Flight Life Flight," "Angel Med Flight," as well as under the names of various other entities. On information and belief, ACLS mingles funds between these entities and persons and does not maintain separate accounting books and records of account for these entities and persons. Essentially, ACLS Pegasus does not have a separate financial identity from Steve Wallace, Karen Wallace, or the various names Steve Wallace conducts business under.

59(d). Thousands of dollars from ACLS Pegasus' accounts have been diverted to Steve Wallace and Karen Wallace. Steve and Karen Wallace have withdrawn thousands of dollars from ACLS Pegasus' accounts, written checks to themselves from ACLS Pegasus' accounts for thousands of dollars, used ACLS Pegasus' accounts to make personal purchases, and funneled at least $64,000 to personal bank accounts.

59(e). On information and belief, ACLS Pegasus has failed to maintain corporate books and records of account in reasonable order.

59(f). ACLS Pegasus and Wallace defrauded Mr. Virata by absconding with $127,500 of Mr. Virata's money and unilaterally cancelling the flight from Scottsdale to Manila that Mr. Virata had paid for, on the false pretext that the $127,500 had not been deposited into ACLS Pegasus' bank account. Bank account records show that,

1   while this money was deposited into ACLS Pegasus' account in April 2011, ACLS

2   Pegasus funneled these funds to defendant Steve Wallace, Karen Wallace, other

3   ACLS Pegasus bank accounts, and various other entities and persons.

4        59(g). As of August 31, 2011, only $101.59 remains in the ACLS bank

5   account into which the $127,500 was deposited.

6   ## FIRST CAUSE OF ACTION

7   ## BREACH OF CONTRACT AND IMPLIED COVENANT OF

8   ## GOOD FAITH AND FAIR DEALING

9   **(By Plaintiff Against Defendants Zemke, Helenic, Archangel, Trauma Flight,**

10   **Trauma Flight 2, Revenue Enhancement Specialists, and Does 1-100)**

11        60.    Plaintiff realleges and incorporates by reference paragraphs 1 through

12   59 above as though fully set forth herein.

13        61.    On information and belief, Defendants Zemke, Helenic, Archangel,

14   Trauma Flight, Trauma Flight 2, Revenue Enhancement Specialists operate

15   businesses as common carriers and hold themselves out to the public as common

16   carriers.

17        62.    On April 6, 2011, Defendant Zemke, on his own behalf and/or on behalf

18   one or more of Defendants Helenic, Archangel, Trauma Flight, Trauma Flight 2,

19   and/or Revenue Enhancement Specialists, offered to provide a charter G4 air

20   ambulance to fly Giovanna and her family from Arizona to Manila, Philippines for

21   $135,000. On April 7, 2011, Plaintiff accepted these terms and transferred $135,000

22   to the bank account designated by Defendant Zemke.

23        63.    On information and belief, Defendants Zemke, Helenic, Archangel,

24   Trauma Flight, Trauma Flight 2, and Revenue Enhancement Specialists operate

25   businesses as common carriers and hold themselves out to the public as common

26   carriers.

27        64.    Later on April 7, 2011, Defendant Helenic, on his own behalf and/or

28   one behalf of one or more of Defendants Zemke, Archangel, Trauma Flight, Trauma

Flight 2, and/or Revenue Enhancement Specialists, contacted Plaintiff's agent, Ms. Tantoco, stating that they could not meet their obligations under the agreement. Defendant Helenic offered to charter a Lear 36 air ambulance to transport Giovanna from Arizona to Manila, Phillipines for $142,500, which included the costs of a medical personnel. Plaintiff agreed to modify their prior agreement.

65.    Plaintiff performed all conditions, covenants, and promises required to be performed in accordance with the agreement.

66.    Defendants Helenic, Zemke, Archangel, Trauma Flight, Trauma Flight 2, and/or Revenue Enhancement Specialists, failed to perform their obligations under this agreement and did not provide the agreed-upon air ambulance service. While the Defendants have returned most of the $7,500 they secretly kept as an "administrative fee," they have failed to return or repay the remaining $127,500 Plaintiff provided to them.

67.    Defendants' conduct was wanton, reckless, showed spite and ill will, and demonstrated a reckless indifference to the interests of others.

## SECOND CAUSE OF ACTION

## BREACH OF CONTRACT AND IMPLIED COVENANT OF

## GOOD FAITH AND FAIR DEALING

**(By Plaintiff Against Defendants Wallace, ACLS Pegasus, and Does 1-100)**

68.    Plaintiff realleges and incorporates by reference paragraphs 1 through 67 above as though fully set forth herein.

69.    On information and belief, Defendants Wallace and ACL Pegasus operate businesses as common carriers and hold themselves out to the public as common carriers.

70.    On information and belief, Defendant Helenic, on his own behalf and/or on behalf of one or more of Defendants Zemke, Archangel, Trauma Flight, Trauma Flight 2, and/or Revenue Enhancement Specialists, entered into an agreement with Defendants Wallace and/or ACLS Pegasus. The agreement provided that Defendants

Wallace and/or ACLS Pegasus would provide the Lear 36 charter air ambulance flight for Giovanna from Arizona to Manila, Philippines on April 10, 2011.

71.    On information and belief, the Defendants intended Plaintiff to directly benefit from the agreement and intended to recognize Plaintiff as the primary party in interest to the agreement.  Moreover, on information and belief, the agreement itself indicated an intent to benefit Plaintiff, Giovanna, and Plaintiff's family.

72.    On information and belief, Defendant Helenic, on his own behalf and/or on behalf of one or more of Defendants Zemke, Archangel, Trauma Flight, Trauma Flight 2, and/or Revenue Enhancement Specialists, deposited $127,500.00 into the bank account of Defendant ACLS Pegasus on or about the morning of April 9, 2011.

73.    On information and belief, Defendants Zemke, Archangel, Trauma Flight, Trauma Flight 2, and/or Revenue Enhancement Specialists performed all conditions, covenants, and promises required to be performed in accordance with the agreement.

74.    Defendant Wallace falsely claimed that that $127,500 had not been deposited into the bank account of ACLS Pegasus when in fact his own banker had earlier informed him that the money had been indeed deposited.  Falsely claiming that $127,500 had not been deposited, Defendant Wallace then cancelled the flight and has refused to return the money.

75.    Defendant Wallace and/or Defendant ACLS Pegasus failed to perform its/their obligations under the agreement, and failed to provide the agreed upon charter air ambulance.

76.    Defendants' conduct was wanton, reckless, showed spite and ill will, and demonstrated a reckless indifference to the interests of others.

## THIRD CAUSE OF ACTION

## CONVERSION

### (By Plaintiff Against All Defendants)

77.     Plaintiff realleges and incorporates by reference paragraphs 1 through 76 above as though fully set forth herein.

78.     Plaintiff owned, possessed, and had a right to possess the $127,500.00 taken by Defendants.

79.     The Defendants intentionally and substantially interfered with Plaintiff's $127,500.00 by taking possession of that money and refusing to return that money to Plaintiff after Plaintiff demanded its return.

80.     Plaintiff did not consent to Defendants' withholding of the $127,500.00.

81.     Plaintiff was harmed by the Defendants' withholding of the $127,500.00.

82.     The Defendants' conduct was a substantial factor in causing Plaintiff's harm.

83.     Defendants' conduct was wanton, reckless, showed spite and ill will, and demonstrated a reckless indifference to the interests of others.

## FOURTH CAUSE OF ACTION

## COMMON LAW FRAUD

### (By Plaintiff Against Defendants Helenic, Zemke, Archangel, Trauma Flight, Trauma Flight 2, Revenue Enhancement Specialists, and Does 1-100)

84.     Plaintiff realleges and incorporates by reference paragraphs 1 through 83 above as though fully set forth herein.

85.     Defendants Helenic and Zemke, on behalf of themselves and Defendants Archangel, Trauma Flight, Trauma Flight 2, and Revenue Enhancement Specialists, made representations to Plaintiff that they would provide a charter flight for Giovanna on April 10, 2011, from Arizona to Manila, Philippines for $135,000.00.

86.     These representations were material, and sufficiently important to

1  influence Plaintiff's or any reasonable person's actions.

2      87.    These representations were false.  While Defendants knew that these

3  representations were false, Plaintiff did not know that these representations were

4  false, and reasonably relied on the truth of the representations.

5      88.    Defendants' conduct was wanton, reckless, showed spite and ill will,

6  and demonstrated a reckless indifference to the interests of others.

7      89.    As a result of his reasonable reliance on Defendants false

8  representations, Plaintiff was damaged.

9                        **FIFTH CAUSE OF ACTION**

10                        **CONSUMER FRAUD**

11                    **(By Plaintiff Against All Defendants)**

12      90.    Plaintiff realleges and incorporates by reference paragraphs 1 through

13  89 above as though fully set forth herein.

14      91.    The Defendants, used deceptive practices, fraud, false pretenses, made

15  false promises, made misrepresentations and misleading representations, and

16  concealed material facts in connection with their advertisement and sale of an air

17  ambulance charter flight from Arizona to Manila, Philippines.

18      92.    The Defendants intended that others rely upon such deceptive practices,

19  fraud, false pretenses, false promises, misrepresentations, misleading representations,

20  and concealed material facts made in connection with their advertisement and sale of

21  the air ambulance charter flight.

22      93.    Plaintiff suffered damages as a result of his reliance on Defendant's

23  deceptive practices, fraud, false pretenses, false promises, misrepresentations,

24  misleading representations, and concealed material facts made in connection with

25  their advertisement and sale of the air ambulance charter flight.

26      94.    Defendants' conduct was wanton, reckless, showed spite and ill will,

27  and demonstrated a reckless indifference to the interests of others.

28      95.    As a result of Defendants' conduct, Plaintiff was damaged.

## SIXTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### (By Plaintiff Against All Defendants)

96.     Plaintiff realleges and incorporates by reference paragraphs 1 through 95 above as though fully set forth herein.

97.     Defendants provided Plaintiff, his agents, and Giovanna with false and incorrect information regarding their ability to provide an air ambulance charter flight from Arizona to the Philippines, and omitted and failed to disclose material information.

98.     Defendants intended that Plaintiff, his agents, and Giovanna rely on the information provided and Defendants provided it for that purpose.

99.     Defendants failed to exercise reasonable care or competence in obtaining or communicating the information.

100.    Plaintiff reasonably and justifiably relied on the information, and was damaged as a result.

101.    Defendants' conduct was wanton, reckless, showed spite and ill will, and demonstrated a reckless indifference to the interests of others.

## SEVETH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (By Plaintiff Against All Defendants)

102.    Plaintiff realleges and incorporates by reference paragraphs 1 through 101 above as though fully set forth herein.

103.    The Defendants' conduct was extreme and outrageous.  The Defendants knew that Plaintiff was particularly susceptible to emotional distress.  Moreover, the Defendants' conduct was not privileged and had no legitimate business purpose. Furthermore, the Defendants abused a relationship with Plaintiff which gave the Defendants actual or apparent authority over the Plaintiff and power to affect Plaintiff's interests.

19

104.    On information and belief, the Defendants' conduct was either intentional or reckless.

105.    The Defendants' conduct caused Plaintiff to suffer severe emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court provide relief as follows:

1.    Compensatory and economic damages, including the $127,500.00 held by Defendants and additional out-of-pocket expenses incurred by Plaintiff according to proof at trial;

2.    Tort damages, including damages for pain, humiliation, and inconvenience according to proof at trial;

3.    Punitive damages for Defendants' wanton and reckless conduct, which demonstrated spite and ill will, and an indifference to the interests of others, according to proof at trial;

4.    Attorneys' fees, costs, and legal document preparation fees according to proof at trial;

5.    Such other and further relief as the Court deems just and proper.

DATED: October 27, 2011

/s/ Kenneth K. Lee

John G. Kerkorian
Craig C. Hoffman
**BALLARD SPAHR LLP**

and

Kenneth K. Lee
David L. Russell
**JENNER & BLOCK LLP**

Attorneys for Plaintiff Luis Virata